IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cr. No. 20-1687 KWR |
| ) | |
| **STEVE WAYNE BARTON,** ) | |
| ) | |
| Defendant. ) | |

### UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE TO THE DEFENDANT'S OBJECTION TO THE PRESENTENCE REPORT (DOC. 62)

The United States recommends a sentence of 30 months of imprisonment as the appropriate disposition here.

### FACTS

On April 19, 2020, a concerned citizen contacted the United States Secret Service (USSS) to report threatening posts on Facebook made by Steve Barton ("the defendant"). The defendant made many threatening posts stating things such as "If Trump Wins? Kill Him," "If Biden Wins? Kill Him," "Save America Now! Murder Every Politician Holding Office In America! Start Over."

On April 20, 2020, USSS Special Agent (SA) Mark Ruggiero contacted the defendant by phone. SA Ruggiero noted in his report that "[The defendant] was immediately apologetic and cooperative during the call. He stated that he would remove the posts as soon as possible, but that Facebook has put a 30-day freeze on his account. He further stated that he would not make similar posts in the future." The defendant acknowledged that his threats could incite violence and again apologized to SA Ruggiero for making the posts.

On August 12, 2020, a Facebook user reported another threatening post made by the defendant stating, "TRUMP IS SATAN! KILL HIM & HIS FAMILY! THIS IS MY COMMAND!"

On August 20, 2020, USSS SA Tom Wiedenhaefer made several unsuccessful attempts to contact the defendant by phone. SA Wiedenhaefer attempted to speak by phone with B.B., the defendant's mother who lives with him. After SA Wiedenhaefer identified himself, B.B. hung up the phone and did not answer his immediate call back.

USSS Intelligence Analyst Sarah Moss revealed that the defendant had created four separate Facebook accounts, two of which contained threatening posts. When posting a threat, the defendant would often include a hyperlink to his other accounts and note that additional information was available on his other three accounts. The defendant's first account contained many threats against former President Donald Trump and President Joe Biden.[1] The threats included the following messages:

- On June 18, 2020, "SHOOT DEAD ON SIGHT! THAT'S A FUCKING COMMAND! DO IT NOW!!!!" This post was alongside an article about then-President Donald Trump.
- On June 23, 2020, "I HAVE A LIST OF POLITICIANS TO BE HUNG BY THE NECK TELEVISED…"
- On June 24, 2020, "KILL TRUMP NOW."
- On August 19, 2020, "BRING ME THE HEAD OF DONALD TRUMP AND JOE BIDEN…"

The defendant's second Facebook account was created under the fictitious name of David House. This account contained numerous threats against former President Trump. The defendant referred to former President Trump as "Satan." The Facebook account also contained

---

[1] At the time of the defendant's crimes, President Biden was a major candidate running for President.

many posts regarding President Biden and celebrities.   The threats included the following messages:

- On July 23, 2020, "BRING ME PRESIDENT DONALD JOHN TRUMP! I AM GOING TO SHOOT HIM IN THE BACK OF THE HEAD ON NATIONAL TELEVISION! PELASE+*"
- On July 26, 2020, "EVERYONE IS FORGIVEN WHEN SATAN IS DEAD!+*"

On August 25, 2020, USSS Intelligence Analyst Michelle Faulkner located a copy of a Facebook video that the defendant posted on July 26, 2020.   In the video, the defendant threatened to shoot former President Trump.   The defendant narrates the video then turns the camera on himself when he makes the threats.   Starting at approximately one minute and 14 seconds into the video[2] and ending at approximately two minutes and 13 seconds, the defendant states as follows:

> It's Satan doing everything to the whole family. And it affects us, but we got it to where we can handle everything. You know, if ya'll were to bring President Trump here to me, I would really enjoy every news media in the world being here and watching me put a bullet right through his head, 'k? That would be good. Let's do that. 'Cause if we get rid of Satan, the rest of 'em are gonna fold up, ok? So bring Trump here, that's why I opened up the airport a couple months ago. San Juan Regional Airport in Farmington, New Mexico. You can land a plane with the President and bring him here and let me fuckin' blow his head off, ok? Let's do that! Want to? It'll be fun. Get him here, ok? And then everything changes instantly. Thank you, I love you. And Trump, I'm fixin' to blow your fuckin' head off, you piece of fuckin' shit.

On August 25, 2020, San Juan County Sheriff's Deputy Eric Barlow and SA Wiedenhaefer interviewed the defendant at his residence located at 4705 Arctic Ct, Farmington, New Mexico 87402.   SA Wiedenhaefer provided the defendant with screenshots of the Facebook accounts for Steve Barton and David House.   The defendant admitted that the

---

[2] The United States intends to lodge with the Court a copy of the defendant's video in advance of the sentencing hearing in this case.   The video is approximately two minutes and 13 seconds long.

accounts belonged to him. The defendant also stated that he was the only person who had access to the accounts and posted content on them. The defendant stated that his posts contained proof that the government was killing its citizens with chemical trails. SA Wiedenhaefer showed the defendant samples of posts containing threats to kill former President Trump and President Biden. The defendant stated that he would stop making threatening posts. The defendant admitted that he had created four separate Facebook accounts. The defendant stated that he alternated between the four separate accounts because people would report his threats to authorities, which would result in temporary bans on his accounts.

## PROCEDURAL AND LEGAL BACKGROUND

On September 10, 2020, a federal grand jury returned an indictment (Doc. 17) charging the defendant with three violations of 18 U.S.C. § 871, that being Threats Against President and Successors to the Presidency, and two violations of 18 U.S.C. § 879, that being Threats Against a Major Candidate for Office of the President.

On January 8, 2021, the defendant pleaded guilty to Count 3 of the indictment charging a violation of 18 U.S.C. § 871, Threats Against President and Successors to the Presidency, pursuant to a written plea agreement (Doc. 54) with the United States.

On April 12, 2021, the United States Probation Office disclosed the defendant's presentence report ("PSR"). Doc. 59. The defendant's total offense level was calculated at 17. PSR Part A ¶ 40. The defendant's criminal history points were calculated at zero resulting in a criminal history category of I. PSR Part B ¶ 47. The resulting imprisonment range is 24 to 30 months. PSR Part D ¶ 91.

On April 20, 2021, the defendant filed a sentencing memorandum and recommended a sentence of "time served."  Doc. 62 at 13.  The defendant's recommended sentence is patently unreasonable and should be denied.  A sentence of 30 months of imprisonment is the appropriate disposition here.

**OBJECTION**

The defendant objects to the PSR's assessment of a six-level increase pursuant to U.S.S.G. § 3A1.2 Official Victim.  PSR Part A ¶ 33.  This section reads:

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by **3** levels.

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels.

U.S.S.G. § 3A1.2(a)-(b).

The defendant concedes that the victim, former President Trump, was a government officer or employee and that the applicable guideline is from Chapter Two, Part A.  Doc. 62 at 5.  The defendant, however, disputes "that he was motivated by the victim's status" and argues that "[h]is motivation cannot be clearly established under the circumstances."  *Id*. at 5-6.  The defendant submits that he "was motivated by his belief that the public was being poisoned by airplane contrails" – not by the former President's status.  *Id*. at 5.  This objection lacks merit.

The defendant blamed former President Trump for alleged government misconduct and threatened to kill him as a result.  This "misconduct," the defendant contended, included the government's use of "chemical trails" to kill its citizens.  In a recorded video, the defendant referred to former President Trump as "Satan" and stated that " … if we get rid of Satan, the rest

5

of 'em are gonna fold up, ok?"   The defendant appeared angry in the video and threatened to shoot former President Trump in the head.   The defendant believed that killing former President Trump would "Save America Now!"   Moreover, the defendant admitted that he knowingly and willfully threatened to kill former President Trump.   *See* Plea Agreement, Doc. 54 at 3-4 ("I knowingly and willfully made the threat to kill President Trump.").   The President's official status is precisely what triggers a violation of 18 U.S.C. § 871, that being Threats Against President and Successors to the Presidency.   In other words, the defendant specifically targeted former President Trump because of his status.   The defendant's argument is nonsensical.   His objection should be denied.

## DISCUSSION

I.   Variance and Departure

The defendant requests that the Court impose a sentence of "time served" which is a shorter duration than the sentencing guidelines recommendation of 24 to 30 months of imprisonment.   This request takes the form alternatively as either a departure or a variance.   In support of his request, he offers his factual circumstances to the Court, arguing that his situation is different from the mainline of threat cases, and so deserving of leniency, as to merit a below-guidelines sentence.   In this, the defendant is mistaken.

"Variance" and "departure" are, of course, terms of art, and though the outcome – a non-guidelines sentence – might be the same, different analyses are required.   *See United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007).   A departure involves application of Chapter 4 or 5 of the sentencing guidelines, while a variance involves consideration of the sentencing factors in 18 U.S.C. § 3553(a).   *Id*.

A. U.S.S.G. § 5H1.6 – Family Ties and Responsibilities

The defendant requests a downward departure based on U.S.S.G. § 5H1.6. That section states that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." Thus, a departure based on family ties and responsibilities should only be granted in "extraordinary circumstances." *United States v. Pena*, 930 F.2d 1486, 1495 (10th Cir. 1991). The commentary to § 5H1.6 reads: "the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration"; on the other hand, consideration of such hardship is appropriate when the "loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant." U.S.S.G. § 5H1.6, comment 1(B)(ii).

The defendant is the primary caregiver for his elderly mother and disabled brother. Doc. 62 at 8. He is also responsible for managing the household finances. *Id*. As a result of the defendant's absence, his mother has moved to a nursing facility. The defendant's disabled brother has experienced a bout of depression in the defendant's absence and has been living alone, although he benefits from VA assistance and has been assigned a social worker to care for him. *Id*. The defendant asserts that the struggles facing his mother and brother qualify as extraordinary circumstances of hardship sufficient to justify a downward departure. The United States does not agree.

The United States does not make light of those struggles, nor of the emotional difficulty attendant upon the defendant's incarceration. However, those struggles do not remove the

defendant's case from the heartland of similarly situated defendants.  The emotional difficulty of separation, the physical symptoms sometimes associated with such emotion, and the monetary hardship from loss of income are inherent in the very nature of incarceration for any defendant with family responsibilities.  The Court should therefore not grant the defendant a downward departure.

      B.  U.S.S.G. § 5H1.3 – Mental and Emotional Condition

The defendant also requests a downward departure pursuant to U.S.S.G. § 5H1.3.  The Court should deny this request.  Pursuant to U.S.S.G. § 5H1.3, "mental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted, except, as provided in [U.S.S.G. § 5K2.0] (Other Grounds for Departure)."  Unfortunately, many defendants who appear before the Court frequently suffer from the ailments that the defendant lists: anxiety, depression, insomnia, mental health conditions, high blood pressure, back/should pain, and drug addiction.  Doc. 62 at 7, 10-11.  Even if departure is authorized under U.S.S.G. § 5H1.3, the defendant's mental or emotional condition are not so extraordinary as to warrant one.

      C.  Variance

As to the defendant's request for a variance, the analysis is different but the result will be the same.  18 U.S.C. § 3553(a) provides factors for consideration in meeting the goals of sentencing.  Those goals are: "(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence for criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  U.S.S.G. § 3553(a)(2).  The United

States considers, in devising a sentence to meet those goals, the following factors: "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing …" (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita v. United States*, 551 U.S. 338, 351 (2007).

Upon consideration of all the factors, a within-guidelines sentence of 30 months of imprisonment meets the sentencing goals. In particular, the United States notes factor (6): "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A sentence within the applicable guideline range is the best approach to preventing unwarranted sentencing disparities between similarly situated defendants. The imprisonment range is 24 to 30 months for a defendant who has this criminal history category and who has committed the offense at issue here.

As moving as the defendant's proffered evidence might be, nothing in it is so out of the ordinary as to make the defendant's case substantially different from other similarly situated defendants who have committed similar crimes. To follow the defendant's argument to its logical conclusion, only those defendants disconnected from all human contact would merit a guidelines sentence. Such a result would clearly thwart the purposes of sentencing enumerated in § 3553(a).

The defendant's mother and disabled brother will be taken care of during his incarceration. The defendant's history and characteristics are unremarkable and do not support a variance. As such, the Court should not grant the defendant's request for a variance of "time served." If the Court so varied from the guideline sentence, the sentence would not promote

9

respect for the law and would be a slap on the wrist such that others would not be deterred. The defendant stands convicted of a serious crime and used social media to incite others to act with violence. A sentence of 30 months of imprisonment provides just punishment for that crime. A guideline sentence is reasonable without being greater than is necessary to comply with the goals of sentencing.

## CONCLUSION

The Court should overrule the defendant's objection to the PSR and deny his requests for a variance and downward departures. The filing of this document in CM/ECF caused a copy to be served electronically on Léon Felipe Encinias, Esq., counsel for the defendant.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*/s/ Samuel A. Hurtado*

Samuel A. Hurtado
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274